# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| COGNITIVE PROFESSIONAL SERVICES INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15-cv-0715 (KBJ) |
| U.S. SMALL BUSINESS ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

In March of 2014, Plaintiff Cognitive Professional Services ("CPS") applied to the U.S. Small Business Administration ("SBA") for admission to the Section 8(a) Business Development program ("Section 8(a) program" or "8(a) BD program"). (*See* Compl., ECF No. 1, ¶ 11.) SBA denied CPS's Section 8(a) application, citing various grounds, including the agency's conclusion that CPS was neither a small business owned and controlled by an "economically disadvantaged individual[,]" nor one that had demonstrated "the potential to successfully meet the business development objectives of the 8(a) BD program." (*See* Letter from Assoc. Adm'r for Bus. Dev., SBA, to Cassandra Coleman (Nov. 6, 2014) ("Final Denial Letter"), ECF No. 30-2, J.A. at 29, 33 (citing 13 C.F.R. §§ 124.104, 124.107).)[1] The three-count complaint that CPS has filed in this Court maintains that the agency's determination that CPS failed to satisfy the eligibility criteria for admission into the Section 8(a) program was arbitrary

---

[1] Page-number citations to the parties' legal filings refer to page numbers that the Court's electronic filing system assigns, while page-number citations to documents contained in the Joint Appendix refer to the Bates numbers.

and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (*see* Compl. ¶¶ 41–43 (Count I)), and was also contrary to certain provisions of the Small Business Act of 1953 ("the Act"), 15 U.S.C. §§ 631–57s (*see* Compl. ¶¶ 44–45 (Count II)).  CPS further contends that the SBA regulation that addresses the potential-for-success factor—13 C.F.R. § 124.107—is "itself invalid" because it does not "reflect the congressional intent of the governing statute." (*Id.* ¶¶ 46–47 (Count III).)

Before this Court at present are the parties' cross-motions for summary judgment. (*See* Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 32-2; Def.'s Mem. of Law in Supp. of Def.'s Cross-Mot. for Summ. J & Opp'n to Pl.'s Mot. ("Def.'s Mem."), ECF No. 31-1.)  CPS argues that it is entitled to judgment as a matter of law because both SBA's regulation governing "potential for success" and the agency's related conclusion that CPS failed to satisfy this criterion are contrary to the text and purpose of the Small Business Act. (*See* Pl.'s Mem. at 24–26.)  CPS also contends that the record evidence did not support SBA's findings regarding CPS's potential for success, and that SBA's determination that CPS was not economically disadvantaged for Section 8(a) program purposes was based on a plainly erroneous interpretation of the agency's own rules. (*See id.* at 20–21, 25.)  SBA's cross-motion for summary judgment rejects each of these contentions and asserts that the agency must prevail as a matter of law. (*See* Def.'s Mem. at 13–21.)

On March 31, 2017, this Court issued an Order in which it **DENIED** CPS's motion for summary judgment and **GRANTED** SBA's cross-motion. (*See* Order of Mar. 31, 2017, ECF No. 37.)  This Memorandum Opinion explains the reasons for that

Order.  In short, and as explained fully below, CPS misreads the Small Business Act

and misunderstands the nature of the Section 8(a) program, and as a result, mistakenly

maintains that SBA's efforts to ensure that Section 8(a) program applicants have a track

record of successful prior business performance are unlawful.  To the contrary, the

Small Business Act is silent regarding the particular findings that SBA must make when

it denies a Section 8(a) program application, and it also does not prescribe the particular

manner in which SBA must evaluate a Section 8(a) program applicant's potential for

success.  Noting this silence, the Court has determined that both SBA's probing

potential-for-success regulation and its potential-for-success finding in the instant case

are permissible and reasonable in light of the text and purpose of the Small Business

Act, and therefore, the Court has concluded that neither agency act is contrary to law.

This Court has also found that the record evidence and relevant regulations support

SBA's determination that CPS lacked the requisite potential for success and failed to

satisfy the economic disadvantage requirement.

## I.  BACKGROUND

### A.  Statutory And Regulatory Framework:  The Section 8(a) Program

Congress enacted the Small Business Act of 1953 in order to encourage and

develop the "capacity of small business" in America, and thereby promote national

"economic well-being" and "security[.]"  15 U.S.C. § 631(a).  The Act tasks the Small

Business Administration with effectuating the statute's purposes and provisions, *see id.*

§ 633(a); per the statute, SBA administers "a preferential contracting program for

socially and economically disadvantaged small businesses," which is called the Section

8(a) Business Development program, *Desa Grp., Inc. v. U.S. SBA*, 190 F. Supp. 3d 61, 63 (D.D.C. 2016); *see also* 15 U.S.C. § 637(a)(1).

Through the Section 8(a) program—which is specifically designed to combat the pervasive effects of discrimination that have historically prevented small, minority-owned businesses from competing on equal footing in the mainstream business economy, *see DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 253–57 (D.D.C. 2012); *see also Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 188 (D.D.C. 2015), *aff'd*, 836 F.3d 57 (D.C. Cir. 2016), *petition for cert. filed*, (U.S. April 13, 2017) (No. 16-1239)—eligible participants are provided with "technological, financial, and practical assistance, as well as support through preferential awards of government contracts." *DynaLantic Corp*, 885 F. Supp. 2d at 243. "[A]dmission to the program is highly desirable" because "the SBA may award a subcontract to an 8(a) program participant on a sole source, i.e., noncompetitive, basis," *Larry Grant Constr. v. Mills*, 956 F. Supp. 2d 93, 93–94 (D.D.C. 2013) (citations omitted), and also because "[p]rogram participants are eligible to receive management and technical assistance provided through SBA's private sector service providers, including (i) counseling and training in the operation of small business and business development; (ii) assistance in developing comprehensive business plans; and (iii) assistance obtaining equity and debt financing[,]" *DynaLantic Corp*, 885 F. Supp. 2d at 245; *see also* 15 U.S.C. § 636(j)(10)(A); 13 C.F.R. § 124.404. Significantly, however, the remedial assistance that the Section 8(a) program offers is available only to those small and minority-owned

businesses that are able to satisfy certain criteria set forth in the Act and in SBA regulations.[2]

As a general matter, in order to qualify for the Section 8(a) program, an applicant must be "[1] a small business which is [2] unconditionally owned and controlled by one or more [3] socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States, and which [4] demonstrates potential for success." 13 C.F.R. § 124.101; *see also* 15 U.S.C. § 637(a)(4)(A), (a)(4)(B), (a)(5), (a)(6)(A), (a)(7)(A). To determine whether a business is considered "small," the agency assigns an industry code to each applicant (there are codes associated with all types economic activity, broken down into "twenty broad sectors"), and then uses a table in the regulations to identify the applicant's corresponding "size standard[.]" *Id.* § 121.101; *see also id.* § 124.102(a)(1); *id.* § 121.201 ("The size standards . . . are expressed either in number of employees or annual receipts in millions of dollars[.]"). The ownership and control requirements are satisfied when a business is "51 percent unconditionally and directly owned" by one or more socially and economically disadvantaged individuals, *id.* § 124.105, and when one or more disadvantaged individuals conduct the business's "management and daily business operations[,]" *id.* § 124.106. *See also* 15 U.S.C. § 637(a)(4)(A), (a)(4)(B).[3]

---

[2] Congress has granted SBA "statutory authority to develop standards for eligibility for the section 8(a) program." *Fagan v. U.S. SBA*, 783 F. Supp. 1455, 1457 (D.D.C.), *aff'd* 19 F.3d 684 (D.C. Cir. 1992); *see also* 15 U.S.C. § 634(b)(6) (authorizing the SBA Administrator to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to this chapter"). Thus, while the Small Business Act itself contains certain eligibility requirements, the implementing regulations that SBA has promulgated further define and explicate the statutory criteria, as described below.

[3] The Act and SBA's regulations contain specific criteria for the identification of "socially and economically disadvantaged individuals[.]" *See* 15 U.S.C. § 637(a)(6), (a)(6)(A); 13 C.F.R. § 124.103, 124.104. For example, the Act defines "[s]ocially disadvantaged individuals" as "those who have been

The final two eligibility requirements—"social and economic disadvantage" and "potential for success"—comprise the bulk of the Court's forthcoming analysis, and thus warrant more detailed explanations.

1.    Economically Disadvantaged Individuals

Section 637(a)(6)(A) of Title 15 of the U.S. Code defines "[e]conomically disadvantaged individuals" as "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A); *accord* 13 C.F.R. § 124.104(a).  As previously noted, it is undisputed that CPS is led by a socially disadvantaged individual (*see supra* n. 3); consequently, the economic disadvantage criterion is what is at issue here.  In order to determine whether a socially disadvantaged individual has experienced "diminished capital and credit opportunities," SBA's regulations provide that the agency will examine the individual's "income for the past three years . . . , personal net worth, and the fair market value of all assets, whether encumbered or not." 13 C.F.R. § 124.104(c).  An individual who exceeds any of the applicable thresholds for personal income, net worth, or total assets "will generally be deemed . . . not economically disadvantaged." *Id.*

With respect to the applicable threshold for an individual's personal income, SBA's regulations provide:  "If an individual's adjusted gross income ["AGI"] averaged

subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5).  By statute, "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities[.]" *Id.* § 631(f)(1)(C).  It is undisputed that CPS is led by a socially disadvantaged individual within the meaning of the relevant statutory and regulatory provisions; therefore, this Court will focus its analysis on the economic disadvantage requirement.

over the three years preceding submission of the 8(a) application exceeds $250,000, SBA will presume that such individual is not economically disadvantaged." *Id.* § 124.104(c)(3)(i). In order to calculate the aforementioned AGI, the regulation specifies that

> [i]ncome received from an applicant or Participant that is an S corporation, LLC or partnership will be excluded from an individual's income where the applicant or Participant provides documentary evidence demonstrating that the income was reinvested in the firm or used to pay taxes arising in the normal course of operations of the firm.

*Id.* § 124.104(c)(3)(ii). In other words, income that (1) an individual receives from a business that is a Section 8(a) program applicant or Participant that (2) that individual reinvests into the applicant or Participant company, will be excluded from the individual's personal income calculation, so long as the applicant or Participant is an S corporation, LLC, or partnership and provides documentary evidence demonstrating the reinvestment. *See id.*

2.    Potential For Success

The Small Business Act also expressly conditions entry into the Section 8(a) program on SBA's determination that, with SBA support, the applicant business will be able to perform contracts awarded through the program and has the potential to succeed in the private sector. The Act states:

> No small business concern shall be deemed eligible for any assistance pursuant to this subsection unless the Administration determines that with contract, financial, technical, and management support the small business concern will be able to perform contracts which may be awarded to such concern under paragraph (1)(C) and has reasonable prospects for success in competing in the private sector.

15 U.S.C. § 637(a)(7)(A).

An SBA regulation further expounds upon the "reasonable prospects for success" requirement, providing that an applicant will be deemed to possess reasonable prospects for success in competing in the private sector if it has been "in business in its primary industry classification for at least two full years immediately prior to the date of its 8(a) BD application[.]" 13 C.F.R. § 124.107. "To satisfy this two-years-in-business rule, the applicant must provide tax returns for the two previous years 'show[ing] operating revenues' in the industry to which it is applying." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 390 (D.D.C. 2015) (alteration in original) (quoting 13 C.F.R. § 124.107(a)). Moreover, per the regulation, an applicant business that cannot satisfy the two-years-in-business rule may nevertheless be deemed to have the potential for success if the applicant meets five enumerated conditions and SBA, in its discretion, decides to grant the applicant a waiver of the two-year rule. *See* 13 C.F.R. § 124.107(b)(1) ("SBA may waive the two years in business requirement if each of the following five conditions are met[.]"). To be eligible for such a waiver, the applicant business must, *inter alia*, have "a record of successful performance on contracts from governmental or nongovernmental sources in its primary industry category[.]" 13 C.F.R. § 124.107(b)(1)(iv).[4]

## B.    Background Facts

In March of 2014, CPS—a corporation that provides workforce and organizational improvement solutions—applied for admission into the Section 8(a)

---

[4] The remaining waiver prerequisites are: "(i) The individual or individuals upon whom eligibility is based have substantial business management experience; (ii) The applicant has demonstrated technical experience to carry out its business plan with substantial likelihood for success if admitted to the 8(a) BD Program; (iii) The applicant has adequate capital to sustain its operations and carry out its business plan as a Participant"; and "(v) The applicant has, or can demonstrate its ability to timely obtain, the personnel, facilities, equipment, and any other requirements needed to perform contracts as a Participant." 13 C.F.R. § 124.107(b)(1)(i)–(iii), (v).

program.  (*See* Def.'s Mem. at 6, 7; Pl.'s Mem. at 6.)  SBA denied CPS's application approximately six months later, citing a variety of reasons for this decision, including that:  (1) Cassandra Coleman, the individual upon whom CPS based its eligibility, was not economically disadvantaged; (2) CPS failed to meet the unconditional ownership requirement; (3) CPS failed to comply with the requirements governing the participation of non-disadvantaged individuals; and (4) CPS had not demonstrated the requisite reasonable prospects for success because it could not satisfy the two-years-in-business rule and did not meet the conditions for a waiver of this requirement.  (*See* Letter from Assoc. Admin., SBA, to Cassandra Coleman (Sept. 17, 2014) ("Initial Denial Letter"), ECF No. 30-2, J.A. at 20−25.)

In response to SBA's denial of its application, CPS timely filed a reconsideration request, in which it provided additional information addressing SBA's stated concerns. (*See* Reconsideration Request, ECF Nos. 30-4 to 30-6, J.A. at 44−327.)  SBA reviewed CPS's request for reconsideration, but concluded that CPS had provided insufficient evidence to warrant rescinding the denial.  (*See* Final Denial Letter, J.A. at 29.)  In its final denial letter, dated November 6, 2014, SBA reaffirmed all of its original reasons for denying CPS's application (*see id.*, J.A. at 29−34); two of these reasons are discussed at length below.[5]

---

[5] SBA's final denial letter made clear that CPS had failed to satisfy all four Section 8(a) program eligibility requirements.  (*See* Final Denial Letter, J.A. at 29−34 (concluding that (1) CPS had not met the unconditional ownership requirement; (2) non-disadvantaged individuals controlled or had the power to control the firm; (3) CPS had not satisfied the potential-for-success requirement; and (4) Ms. Coleman was not economically disadvantaged).)  However, CPS's failure to satisfy any one requirement would have justified the agency's denial decision, *see* 13 C.F.R. § 124.101, and thus, this Court has opted to focus its attention on the agency's conclusions regarding CPS's prospects for success and Ms. Coleman's lack of economic disadvantage.

1.    SBA's Findings Regarding CPS's Prospects For Success

In its final denial letter, SBA concluded that CPS had failed to meet a number of criteria which, under 13 C.F.R. § 124.107, are necessary to demonstrate reasonable prospects for success.  (*See id.*, J.A. at 32−34.)  First, SBA concluded that CPS had "not generated revenues in its primary industry for two consecutive years[,]" and therefore failed to satisfy the two-years-in-business requirement.  (*Id.*, J.A. at 32.)

SBA also found that CPS had not satisfied two out of the five criteria for a waiver of the two-years-in-business requirement.  (*See id.*, J.A. at 33.)  Specifically, SBA noted that CPS had failed to demonstrate "a record of successful performance on contracts from governmental or nongovernmental sources in its primary Industry category[,]" as required by 13 C.F.R. § 124.107(b)(1)(iv).  (*Id.*)  SBA acknowledged that CPS had recently changed its primary industry code, but the lack of evidence of completed contracts in CPS's (current) primary industry meant that SBA was unable to "verify a track record of performance on contracts from governmental or nongovernmental sources in [CPS's] primary industry."  (*Id.*)  SBA further concluded that CPS did not have "adequate capital to sustain its operations and carry out its business plan as a Participant"—another requirement for a waiver of the two-years-in-business rule, *see* 13 C.F.R. § 124.107(b)(1)(iii)—because CPS had "only generated a small portion of its sales from" the industry code under which it sought certification and had "generated most of its revenues" from its former industry code.  (*Id.*, J.A. at 33.)

## 2. SBA's Findings Regarding Economic Disadvantage

SBA also determined that CPS had failed to satisfy the economic disadvantage requirement because Coleman had averaged an adjusted gross income in excess of $250,000 over the previous three years. (*See id.*, J.A. at 30.) SBA specifically noted that Coleman had listed her AGI on her IRS 1040 Forms as follows: $260,107 (2013), $1,084,957 (2012), and $67,833 (2011). (*See id.*) SBA took the average of these three figures to arrive at a three-year AGI of over $400,000, which exceeded the applicable $250,000 threshold and thus triggered a presumption that Coleman was not economically disadvantaged. (*See id.*) *See also* 13 C.F.R. § 124.104(c)(3)(i).

SBA further explained its reasons for rejecting the alternative calculation that CPS had proffered in its reconsideration request. (*See* Final Denial Letter, J.A. at 30.) CPS argued that SBA should have excluded from its calculation of Coleman's 2012 AGI approximately $922,000 that Coleman received as income from an organization called Harvest Professional Services Company ("Harvest"). (*See* Reconsideration Request, J.A. at 49−50; *see also* Final Denial Letter, J.A. at 30.) Coleman had purportedly invested this $922,000 from Harvest into CPS, and CPS argued that, per 13 C.F.R. § 124.104(c)(3)(ii)—which is quoted above—SBA should have excluded this income from Coleman's AGI. (*See* Reconsideration Request, J.A. at 49−50; *see also* Pl.'s Mem. at 7−8.) SBA responded that "[s]ince Harvest Professional Services Company is not the applicant or Participant, income from this company cannot be excluded" under that regulation, and "there are no provisions in the regulations for excluding the Income from Harvest Professional Services Company[,]" as CPS had requested. (Final Denial Letter, J.A. at 30; *see also id.* (noting that CPS's "request to

exclude this income was reviewed by Senior Legal Counsel, who concurred that this income could not be excluded and that your adjusted average three year income was excessive").)

### C. Procedural History

After it received SBA's final denial letter, CPS filed a timely appeal petition to SBA's Office of Hearings and Appeals ("OHA"), requesting a review of the agency's decision. (*See* Order Granting Agency's Mot. to Dismiss ("ALJ Decision"), ECF No. 30-1, J.A. at 1.) In lieu of an Answer, SBA filed a motion to dismiss for lack of jurisdiction, which the ALJ granted, citing 13 C.F.R. § 134.405(a)(1). (*See* ALJ Decision, J.A. at 5; Mot. to Dismiss for Lack of Jurisdiction ("SBA's Mot. to Dismiss"), ECF No. 30-2, J.A. at 12−18.) *See also* 13 C.F.R. § 134.405(a)(1) (instructing Administrative Law Judges to dismiss certain types of appeals for lack of jurisdiction, "including appeals of denials of 8(a) BD program admission based in whole or in part on grounds other than a negative finding of social disadvantage, economic disadvantage, ownership or control"). The ALJ's summary dismissal made SBA's denial letter of November 5, 2014 the agency's final action. *See* 13 C.F.R. § 124.206(a).

Then, on May 11, 2015, CPS filed the instant complaint, which alleges, in Count One, that SBA violated the APA because all of the agency's stated reasons for denying CPS admission to the Section 8(a) program, including its potential-for-success and economic disadvantage findings, were arbitrary, capricious, and unsupported by the evidence before the agency. (*See* Compl. ¶¶ 42−43.) The complaint also asserts, in Counts Two and Three, that both the SBA regulation governing potential for success

and SBA's conclusion that CPS had not demonstrated potential for success violated the Small Business Act, because neither "required [a] determination from the SBA as to whether the applicant firm would have reasonable prospects for success with SBA's assistance[.]"  (*See id.* ¶ 47; *see also id.* ¶ 45.)

CPS filed its motion for summary judgment on November 13, 2015.  (*See* Pl.'s Mot. for Summ. J., ECF No. 14.)  In its memorandum in support of the motion, CPS expanded upon and clarified its theories of relief, which appear to fit into three general categories.  For example, the motion asserts that SBA's regulation regarding potential for success (13 C.F.R. § 124.107) is contrary to law because it "does not include a required determination from the SBA as to whether the applicant firm would have reasonable prospects for success with SBA's assistance[.]"  (Pl.'s Mem. at 26 ("The pertinent regulation . . . does not reflect the congressional intent of the governing statute.").)  Relatedly, CPS contends that SBA's finding regarding CPS's potential for success was facially non-complaint with the enabling statute because it failed to include a "statutorily required" determination regarding CPS's potential for success with the agency's support.  (*Id.* at 25 (emphasis omitted); *see also id.* at 24 ("SBA's findings in this regard were not consistent with the statute under which the regulation was written.").)  CPS further maintains that it provided SBA with ample evidence to demonstrate that it satisfied the potential for success requirement as written, and that the agency's conclusion to the contrary was unsupported by the record evidence.  (*See* Pl.'s Combined Reply in Supp. of Pl.'s Mot. for Summ. J. & Opp'n to Def.'s Cross-Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 32-4, at 15–21; *see also id.* at 15 ("Plaintiff demonstrated that it had the potential to successfully meet the business

development objectives of the 8(a) Program.").)  Finally, CPS argues that SBA's

conclusion that Coleman was not economically disadvantaged was based on a plainly

erroneous interpretation of SBA's own regulation.  (*See* Pl.'s Mem. at 20−21; *see also*

*id.* at 21 ("If the SBA had correctly calculated Ms. Coleman's AGI under the . . .

regulation, the Agency would have seen that her average income over the three years

. . . did not exceed $250,000.").)

In its cross-motion for summary judgment, which was filed on January 29, 2016,

SBA contends that its potential-for-success regulation and conclusion were both

consistent with the Small Business Act.  (*See* Def.'s Mem. at 18−21.)  In addition, SBA

maintains that it is entitled to judgment as a matter of law because its decision to deny

CPS admission into the Section 8(a) program was supported by substantial evidence and

was not based on a plainly erroneous interpretation of its own regulation.  (*See id.* at

13−18; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), ECF No. 32-2 at 9−10.)

The parties' cross-motions are now ripe for this Court's review.  (*See* Pl.'s Mem.;

Def.'s Mem.; Pl.'s Opp'n; Def.'s Reply.)

## II.    LEGAL STANDARDS

### A.    Summary Judgment Motions In APA Cases

"Although Federal Rule of Civil Procedure 56 provides the ordinary summary

judgment standard, it is well established that, in cases involving review of a final

agency action[,] . . . the standard set forth in [Rule 56] does not apply because of the

limited role of a court in reviewing the administrative record."  *Otsuka Pharm. Co., Ltd.*

*v. Burwell*, No. 15-cv-1688, 2016 WL 4098740, at *6 (D.D.C. July 28, 2016)

(alterations in original) (internal quotation marks and citation omitted).  When

assessing a motion for summary judgment in an APA case, "the district judge sits as an appellate tribunal[,]" *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and "[t]he entire case on review is a question of law, and only a question of law[,]" *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Notably, "[t]he Court's review is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously, or in violation of another [APA] standard[.]" *Desa Grp.*, 190 F. Supp. 3d at 68. That is, "under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Clarian Health West, LLC v. Burwell*, 206 F. Supp. 3d 393, 406 (D.D.C. 2016) (internal quotation marks, citation, and alteration omitted).

### B.    The APA's Review Standards

The parameters of the district court's authority to decide "whether the agency acted arbitrarily or capriciously, or in violation of another [APA] standard[,]" *Desa Grp.*, 190 F. Supp. 3d at 68 (internal quotation marks and citation omitted), are set forth in the APA itself. That statute requires reviewing courts to set aside agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has made clear that, when evaluating agency actions under this standard, a court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for

its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

Moreover, "[a]gency fact finding, even in an informal adjudication, must be supported by substantial evidence[.]" *Desa Grp.*, 190 F. Supp. 3d at 68 (internal quotation marks and citation omitted); *see also Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) ("When the arbitrary or capricious standard is performing [the] function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense[.]" (emphasis in original)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Accordingly, an agency's findings of fact should be set aside "only when the record is so compelling that no reasonable factfinder" could have reached the agency's conclusion, *Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 222 (D.D.C. 2016), or when the agency has "ignore[d] evidence contradicting its position," *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

Notably, if what is at issue in an APA case is the "agency's interpretation of a statute that it administers[,]" the court employs "the two-step framework" that the Supreme Court adopted in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984). *W. Minn. Mun. Power Agency v. FERC*, 806 F.3d

588, 591 (D.C. Cir. 2015) (citing *Chevron*, 467 U.S. at 842–43 (1984)). Step One directs that, if "Congress has directly spoken to the precise question at issue," then the court must give effect to that "unambiguously expressed intent." *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 414 F.3d 50, 57 (D.C. Cir. 2005) (internal quotation marks and citation omitted); *see also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) (explaining that the Step One question is not whether the pertinent statutory terms are "in some abstract sense, ambiguous, but rather whether, read in context and using the traditional tools of statutory construction," the terms unambiguously mean what the party claiming victory at Step One says they mean (citation omitted)). But if the statute at issue "can be read more than one way[]" and is thus ambiguous, *AFL-CIO v. FEC*, 333 F.3d 168, 173 (D.C. Cir. 2003) (citation omitted), or if the statute is "silent" regarding the relevant question, *see Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016), the court moves on to Step Two, which requires the court to defer to the agency's interpretation so long as it "is based on a permissible construction of the statute[,]" *Chevron*, 467 U.S. at 843.

Finally, in appropriate cases, agencies are entitled to a special category of deference called *Auer* deference. *See generally Auer v. Robbins*, 519 U.S. 452 (1997). Under *Auer*, when an agency interprets "its own ambiguous regulation[s]," a court should defer to that interpretation unless it is "plainly erroneous or inconsistent with the regulation[s][,]" or there "is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (internal quotation marks and citations omitted). "The clear corollary of the *Auer* rule is that

deference to the agency's interpretation of its own regulations is not required if the meaning of the regulation is plain." *Otsuka*, 2016 WL 4098740, at *7.

## III.    ANALYSIS

CPS makes three primary arguments in its cross-motion for summary judgment. First, it maintains that this Court should set aside SBA's decision denying CPS admission to the Section 8(a) program as a matter of law, because neither the agency's denial letter to CPS nor the agency's implementing regulation included or required a purportedly mandatory agency determination regarding CPS's "prospects for success with contract, financial, and management support from the Agency" (Pl.'s Reply at 19 (emphasis omitted))—at least not in the manner that CPS believes is legally required (*see* Pl.'s Mem. at 5 (emphasizing that Congress intended the 8(a) program to "be a 'business development' program[,]" and arguing that SBA impermissibly "puts the onus on the applicant to show that it 'qualifies' for admission to the program while putting no responsibility on the Agency itself")).  Second, CPS argues that the evidence it submitted to SBA clearly demonstrated that CPS was entitled to a waiver of the two-years-in-business requirement (which would satisfy the potential-for-success mandate) as a matter of fact, and that the record did not support the agency's conclusion to the contrary.  (*See* Pl.'s Reply at 15–18; *see also* Compl. ¶ 33.)  Third, and finally, CPS contends that SBA's determination about economic disadvantage as it relates to CPS's owner, Cassandra Coleman, was based on a plainly erroneous interpretation of SBA's own regulation.  (*See* Pl.'s Mem. at 20–21.)  As explained fully below, CPS appears to have a fundamental misunderstanding about the nature of the Section 8(a) program that the Small Business Act establishes, as well as SBA's role in implementing it, and its

view fails to recognize this Court's limited role in evaluating an agency's regulations and determinations in the context of an APA action. Thus, all three of CPS's arguments—many of which involve strained contentions about SBA's regulations and findings—miss the mark.

### A. SBA's Potential-For-Success Regulation, And The Related Agency Findings That Appear In CPS's Denial Letter, Are Not Contrary To Law

CPS argues that the Small Business Act *requires* SBA to make a determination regarding a Section 8(a) program applicant's "reasonable prospects for success" with "contract, financial, technical, and management support[,]" yet SBA's potential-for-success regulation (13 C.F.R. § 124.107) requires no such determination, and SBA did not mention having conducted this evaluation in its denial letter to CPS. (*See* Pl.'s Mem. at 25 ("In the Decision Letter there was no mention of any determination by the SBA of whether Petitioner would have reasonable prospects for success with contract, financial, technical, and management support from the Agency in compliance with the statute." (emphasis omitted) (citing 15 U.S.C. § 627(a)(2)(A))); *id.* at 26; *see also* Pl.'s Opp'n at 20 ("Petitioner was not afforded that determination as is *facially apparent* in the decision letter itself." (emphasis in original))).) In addition, and relatedly, CPS suggests that 13 C.F.R. § 124.107 is inconsistent with the Small Business Act because the regulation does not require SBA to evaluate an applicant's potential for success with agency support in the manner that the statute requires. (*See* Pl.'s Opp'n at 21, 22 (asserting that the regulation "does not reflect the congressional intent of the governing statute[]" because "the 8(a) BD Program is not a 'contracts program,' [but] is by its very title a 'business development program'").)

The true gravamen of CPS's arguments appears to be its concern that, although the Small Business Act "clearly requires a determination by the SBA of whether an applicant for the SBA's 8(a) BD program would have reasonable prospects for success *with* contract, financial, technical and management support from the Agency[,]" (Pl.'s Mem. at 5 (emphasis added)), SBA is essentially requiring applicants for the Section 8(a) program to demonstrate that they have the capacity to perform Section 8(a) contracts in and of themselves—i.e., that SBA is failing to acknowledge that the Section 8(a) program is "a 'business development' program—not a contracts program" (*id.*).  In this regard, CPS maintains that SBA is improperly "put[ting] the onus on the applicant to show that it 'qualifies' for admission to the program while putting no responsibility on the Agency itself." (*Id.* at 5; *see also id.* at 25 (asserting that "[a]n SBA applicant does not apply to the 8(a) Program 'ready made' but submits its application in *recognition* of its need for special assistance from the SBA" (emphasis in original)).) Therefore, the argument goes, an SBA regulation that fails to demand that the agency expressly evaluate an applicant's prospects for success *with* the agency's support is inconsistent with the Small Business Act, as is any denial letter that does not report the agency's conclusions regarding the applicant's potential for success in this fashion. (*See id.* at 5, 25–26.)

Of course, whether CPS is right about this alleged violation of the Small Business Act depends entirely on what determinations the statute actually requires SBA to make—both in general and in connection with the potential-for-success criterion. And because *that* question implicates SBA's own interpretation of the scope of its statutory mandate, it must be analyzed pursuant to the two-step *Chevron* standard.  *See*

*Council for Urological Interests v. Burwell*, 790 F.3d 212, 219 (D.C. Cir. 2015) ("At

step one, to determine whether Congress has directly spoken to the precise question at

issue, we use the traditional tools of statutory interpretation. . . . If the statute is silent

or ambiguous on the matter, we move to a second step that asks whether the agency's

interpretation is based on a permissible construction of the statute." (internal quotation

marks and citations omitted)).  For the following reasons, this Court concludes that the

Small Business Act is silent regarding the determinations SBA must make when it

denies a Section 8(a) program application, and the agency's interpretation of its

statutory mandate (as manifested in its regulations and the decision letter here) is

permissible.  Therefore, neither SBA's potential-for-success regulation nor the agency's

application of that regulation in the instant context violates the Small Business Act.

> 1.    The Small Business Act Is Silent Regarding What Determination, If Any, The Agency Is Required To Make Under These Circumstances, As Well As The Particular Manner In Which The Agency Must Evaluate An Applicant's Potential For Success

The *Chevron* analysis begins "as always, by asking whether Congress has spoken

to the precise question at issue."  *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297

(D.C. Cir. 2003) (internal quotation marks and citation omitted).  CPS's argument—i.e.,

that the Small Business Act "clearly requires a determination by the SBA of whether an

applicant . . . would have reasonable prospects for success with [agency support]," but

the regulations do not mandate any such determination and SBA failed to make that

statutorily required determination here (Pl.'s Mem. at 5)—implicates two distinct, yet

closely related, legal issues.  The first is whether the Act demands that SBA make *any*

particular finding when it undertakes to evaluate a Section 8(a) program application.

The second relates to how the agency is to consider the potential-for-success-with-

agency-support factor; that is, in what manner must SBA evaluate an applicant's potential for success with agency support?  The pertinent analysis of whether Congress has spoken directly to either of these issues begins with an evaluation of the text of the relevant statute.  *See S. Cal. Edison Co. v. FERC*, 195 F.3d 17, 23 (D.C. Cir. 1999) (citation omitted); *see also Abbott Labs. v. Young*, 920 F.2d 984, 987 (D.C. Cir. 1990) (explaining that "the language of the statute itself is always the best indication of congressional intent[]"); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 37 (D.D.C. 2000) ("*Chevron* analysis often begins and ends with the statutory text[.]").

As mentioned above, in clause (A) of section 637(a)(7), the Small Business Act states:

> No small business concern shall be deemed eligible for any assistance pursuant to this subsection unless the Administration determines that with contract, financial, technical, and management support the small business concern will be able to perform contracts which may be awarded to such concern under paragraph (1)(C) and has reasonable prospects for success in competing in the private sector.

15 U.S.C. § 637(a)(7)(A).  Notably, the plain text of the statute clearly suggests a background principle of *exclusion*, which the subordinate conjunction "unless" qualifies.  *See Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.*, 535 P.2d 419,423 (Kan. 1975) ("The word 'unless' is a subordinating conjunction in common usage, connecting a dependent or subordinate clause of a sentence with the main or primary clause.").  Thus, as a general matter, Congress clearly intended for the assistance that the Section 8(a) program confers to be a restricted commodity that is available only to certain Section 8(a) program applicants, and only when the agency determines that certain conditions have been met.

With respect to the question of whether this provision demands that SBA make any particular factual determinations regarding a Section 8(a) program application, the Act plainly establishes one requirement before SBA can deem any applicant eligible for assistance: the agency must "determine[]" the applicant "will be able to perform contracts" and "has reasonable prospects for success" with "contract, financial, technical, and management support[.]" 15 U.S.C. § 637(a)(7)(A). But the Act does not indicate that this factual determination is the *only* relevant criterion the agency can consider when it evaluates an application, nor does it specify what factual determinations, if any, SBA must make prior to *denying* an application. Thus, by its plain terms, the Act merely sets the *floor* for a finding of eligibility, and it says nothing about whether and to what extent SBA can (1) establish via regulations additional criteria that the successful Section 8(a) program applicant must satisfy in order to be admitted into the program, and (2) deny an applicant admission into the program on the grounds that any of those additional criteria are unmet. Indeed, the natural corollary to the observation that Congress has established necessary but insufficient conditions for admission into the Section 8(a) program (e.g., that an applicant have the ability to perform contracts with agency support and have reasonable prospects for success) is that SBA is free to establish additional regulatory criteria, *cf.* 15 U.S.C. § 634(b)(6) (authorizing the SBA Administrator to "make such rules and regulations as he deems necessary to carry out the authority vested in him by or pursuant to this chapter"), and thus SBA can decide that an applicant's failure to establish any of the regulatory criteria is grounds for denial of an application, without regard to any determination

about whether the applicant has reasonable prospects for success or the ability to perform contracts with agency support.

This means that CPS is wrong to insist that the Small Business Act unambiguously mandates that SBA make a prospects-for-success determination, specifically, in every case. (*See* Pl.'s Mem. at 25 (arguing that SBA's denial letter was arbitrary and capricious because it failed to include this "*statutorily required*" determination (emphasis in original)).) CPS has not pointed to anything in the text or the broader context of the statute that addresses the agency's obligations prior to denying an applicant's request for admission to the Section 8(a) program, nor has it demonstrated that the statute requires a determination regarding the potential-for-success issue in all circumstances. Therefore, the text of the statute is silent regarding what determination, if any, the agency is required to make when it denies a Section 8(a) program application, and thus, for the purpose of the first step of the *Chevron* analysis, it cannot be said that the Act unambiguously requires SBA to reach a conclusion regarding the applicant's prospects for success with agency support and express that conclusion on the face of an applicant's denial letter.

For similar reasons, the closely-related legal issue that CPS's argument presents—namely, in what manner must SBA evaluate an applicant's potential for success with agency support when it undertakes to do so—also cannot be resolved at *Chevron* Step One. As explained above, CPS takes issue with SBA's prospects-for-success regulation and the denial letter it issued in this case because neither reference any agency evaluation of CPS's "prospects of success *with contract, financial, technical, and management support from the Agency*[.]" (Pl.'s Mem. at 5 (emphasis

added); *see also* Pl.'s Opp'n at 22 (asserting that "the 8(a) BD Program is not a 'contracts program,' [but] is by its very title a 'business development program'").)  But CPS has not shown that the Small Business Act requires the agency to evaluate an applicant's reasonable prospects for success in any particular fashion, much less engage in some specific inquiry regarding the extent to which "*support from the Agency*" (Pl.'s Mem. at 25 (emphasis in original)) will bolster the applicant's prospects for success.

Rather, by its terms, the Small Business Act requires only that SBA not deem an applicant eligible for assistance without determining that, with "contract, financial, technical, and management support[,]" the applicant "will be able to perform [awarded] contracts" and "has reasonable prospects for success in competing in the private sector."  15 U.S.C. § 637(a)(7)(A).  It appears that the evaluation of the applicant's performance "with contract, financial, technical, and management support" relates primarily (if not solely) to the applicant's performance of future contracts.  *Id.*  But in any event, the statute neither defines "reasonable prospects for success" nor clearly speaks to the question of how, exactly, SBA should go about making the reasonable-prospects-for-success determination.  In light of this silence, as well as the broad grant of authority that Congress has given to SBA to implement the Section 8(a) program, this Court is not persuaded by CPS's argument that a regulation and decision letter that do not specifically address the applicant's prospects for success with agency support (in the manner that CPS understands this inquiry) run afoul of the unambiguous text of the statute, and thus, the Court must proceed to *Chevron*'s Step Two.  *See Chevron*, 467 U.S. at 843 (explaining that courts proceed to Step Two whenever Congress has

"implicitly or explicitly . . . left a gap for the agency to fill[]" (internal quotation marks and citation omitted)).

<div style="margin-left: 2em;">

2.    <u>SBA's Decision To Include Various Criteria In Its Potential-For-Success Regulation, And To Evaluate CPS's Application In The Manner Outlined In Its Denial Letter, Was Entirely Permissible</u>

</div>

It is clear beyond cavil that, when Congress is silent as to the relevant issue or issues, courts must defer to an agency's construction of a statute "unless it is arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. For Med. Educ. & Research v. U.S.*, 562 U.S. 44, 53 (2011) (internal quotation marks and citation omitted). Because this Court has found that the Small Business Act is silent regarding the particular findings that SBA must make when it denies a Section 8(a) program application, and also the particular mechanism that SBA must use to evaluate an applicant's potential for success, the Court's task at this stage of the *Chevron* analysis is to determine whether SBA's construction of the Small Business Act (in the form of the regulations that the agency has adopted pursuant to that statute and its application of the regulations in this context) is permissible. *See Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004). As explained below, the Court finds that SBA's potential-for-success regulation is consistent with the statutory mandate, and that it was eminently reasonable for the agency to conclude that its denial letter satisfied the Act's directives, for several reasons.

First of all, the regulation contains numerous factors that rationally relate to an applicant's potential for success and that help the agency to assess whether the applicant can successfully perform Section 8(a) contracts with the agency's support. For example, as discussed above, SBA's potential-for-success regulation provides that an applicant "must be in business in its primary industry classification for at least two

full years immediately prior to the date of its 8(a) BD application, unless a waiver of this requirement is granted[,]" 13 C.F.R. § 124.107, by demonstrating, *inter alia*, "a record of successful performance on contracts from governmental or nongovernmental sources in its primary industry category[,]" *id.* § 124.107(b)(1)(iv), and "technical experience to carry out its business plan with a substantial likelihood for success[,]" *id.* § 124.107(b)(1)(ii). (*See supra* Part I.A.2.) The requirement that an applicant be in business in its primary industry category for at least two full years prior to the date of its application appears reasonably calculated to assess an applicant's potential for success with the agency's support, because an applicant with little or no experience in its primary field is arguably less likely to succeed "in competing in the private sector[,]" with or without assistance from SBA. 15 U.S.C. § 637(a)(7)(A).

Likewise, the five enumerated waiver conditions—which include, *inter alia*, the "ability to timely obtain[] the personnel, facilities, equipment, and any other requirements needed to perform contracts[;]" "adequate capital to sustain its operations and carry out its business plan[;]" and "demonstrated technical experience to carry out its business plan with a substantial likelihood for success[,]" 13 C.F.R. § 124.107(b)(1)—also appear reasonably connected to the statute's directive. Congress has tasked SBA with the responsibility to discern which among the many Section 8(a) program applicants "will be able to perform contracts which may be awarded" and possess "reasonable prospects for success in competing in the private sector[,]" 15 U.S.C. § 637(a)(7)(A), and the waiver requirements listed in SBA's regulation are certainly relevant to this directive. Therefore, notwithstanding CPS's contention that the regulation establishes an impermissibly stringent framework from which to evaluate

an applicant's potential for success (*see* Pl.'s Mem. at 5 (arguing that "the regulation

puts the onus on the applicant to show that it 'qualifies'"); *id.* (emphasizing that

Congress intended for the Section 8(a) program to "be a 'business development'

program—not a contracts program")), the Court finds that the capacity-related factors

that CPS has incorporated into its regulation are not arbitrary and capricious, or

otherwise inconsistent with the directives of the Small Business Act.

The Court further finds that SBA's application of the potential-for-success

regulation, as described in the CPS denial letter, was entirely reasonable. For starters,

SBA appears to have scrutinized the regulation's various factors carefully, and

explained them thoroughly, when it denied CPS's Section 8(a) program application.

For example, SBA's six-page letter addresses several different regulatory factors that

the agency concluded CPS failed to satisfy—such as economic disadvantage,

unconditional ownership, and control—and provided detailed justifications for the

agency's conclusions. (*See* Final Denial Letter, J.A. at 29–34.) In addition, SBA

described *how* it determined that CPS could neither satisfy the two-years-in-business

requirement nor the conditions necessary for a waiver of this rule. (*See id.* at 33

(noting the absence of "income tax returns for each of the two previous tax years

showing operating revenues in the primary industry in which [CPS] is seeking"

certification and concluding that, as a result, "the potential for success requirement is

not met"); *see also id.* ("SBA cannot verify a track record of performance on contracts

from governmental or nongovernmental sources in [CPS's] primary [i]ndustry.").)

Having analyzed CPS's application with this level of specificity, it was reasonable for

SBA to conclude that it need not perform an additional probing analysis of CPS's

prospects "*with* contract, financial, technical, and management *support from the Agency*" in the manner that CPS demands. (Pl.'s Mem. at 5 (emphasis added); *see also id*. (suggesting that SBA must make a particularized assessment of each applicant's prospects for success with various types of support from SBA).)

To the extent CPS argues that it is entitled to summary judgment because SBA's denial letter completely ignores the statutory 'prospects for success with agency support' mandate (*see id.* at 25), CPS misunderstands what the Small Business Act requires. First of all, as explained in Part III.A.1 above, the text of the statute makes clear that the Act is grounded on a background principle of *exclusion*, and that only a select group of Section 8(a) applicants can be deemed eligible for *inclusion* in the program. Against this backdrop, it appears that Congress's primary concern was ensuring that those small businesses that the agency admits into the program have the capacity to succeed, and *not* that the program include any and all purported business ventures that might conceivably be able to perform contracts if supported by the Agency, as CPS suggests. Indeed, in this Court's view, CPS's repeated contention that the Section 8(a) program "is *a business development* program—not a contracts program" and that the assistance it provides was not intended for "'ready-made'" companies (*id.* at 25 (emphasis in original)), not only finds little support in the text and structure of the relevant statutory provision, it also runs counter to the fact that underdeveloped, not-yet-ready-to-perform businesses appear to be precisely the applicants Congress was trying to exclude when it stated that "no small business concern shall be deemed eligible" without an agency assessment of its prospects for success. 15 U.S.C. § 637(a)(7)(A). Put another way, far from preventing SBA from

evaluating an applicant's performance history, the statute plainly requires the agency to ensure that Section 8(a) program participants are viable businesses before they are included in the program.

Even assuming, *arguendo*, that CPS has a proper conception of what Congress intended regarding the agency's evaluation of an applicant's potential for success with agency support, it is significant that SBA could have denied CPS's application without referencing any potential-for-success-with-agency-support finding at all, because, as explained above, CPS's failure to establish *any* of the various regulatory criteria is sufficient to justify denial. Moreover, while SBA opted to address CPS's potential for success in the denial letter at issue here, SBA may very well have conceived of its detailed analysis as an assessment of CPS's potential for success with the types of agency support the program provides. To be sure, the agency might have provided more clarity on this front—say, by including language that expressly stated that "CPS has failed to demonstrate its potential for success with SBA's support"—but this Court will not, and cannot, draft the agency's denial correspondence. Instead, the Court is tasked solely with ensuring that the agency's actions are not "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found.*, 562 U.S. at 53 (internal quotation marks and citation omitted). And, here, the Court finds that SBA's consideration of various factors that are reasonably related to CPS's ability to perform was permissible, and was certainly not so unreasonable as to render the agency's application of the regulation in violation of the law.

**B.  The Agency's Conclusion That CPS Lacked The Potential For Success Was Well Supported**

CPS's second major challenge to the rejection of its Section 8(a) program application is factual in nature, and requires the Court to examine the evidence that SBA considered when it determined that CPS lacked the potential for success within the meaning of 13 C.F.R. § 124.107(b)(1).  In short, CPS argues that, while its Section 8(a) program application did not satisfy the two-years-in-business rule because CPS did not have two years of business experience in the relevant industry category, there was ample evidence of its satisfaction of the waiver criteria.  (*See* Pl.'s Opp'n at 15−18 (suggesting that the record evidence did not support SBA's conclusion that CPS had failed to demonstrate its entitlement to a waiver); *see also id.* at 15−17 (pointing to evidence such as Ms. Coleman's resume and a four-page letter entitled "'Two Years in Business Waiver Request'").)  For the reasons explained below, this Court concludes that the record evidence fully supports SBA's conclusion that CPS did not have the requisite potential for success because it was not entitled to a waiver of the two-years-in-business rule.

First of all, there is no dispute that CPS failed to satisfy the regulatory requirement that an applicant "be in business in its primary industry classification for at least two full years immediately prior to the date of its 8(a) BD application," 13 C.F.R. § 124.107, which is, in essence, a length-of-service mandate.  (*See* Reconsideration Request, J.A. at 91 (acknowledging that CPS could not satisfy the two-years-in-business rule because it had recently "rebranded and changed [its] primary [industry

code]").)[6]  The regulation also contains a provision that permits the agency to waive this two-year requirement (*see supra* Part I.A.2), and notably, under both the default two-years-in-business rule and the waiver provision, an applicant must provide some evidence of work performed in the applicant's primary industry category.  *See e.g.*, 13 C.F.R. § 124.107(b)(1)(iv) (requiring the applicant who seeks a waiver to demonstrate a "record of successful performance on contracts from governmental or nongovernmental sources in its primary industry category").  The two-year rule and the waiver requirements differ insofar as the waiver provision seeks evidence of "successful performance *on contracts*[,]" and does not require any particular length of service.  *Id.* (emphasis added).

In the instant case, SBA denied CPS's request for a waiver on the grounds that "SBA [could not] verify a track record of performance on contracts from governmental or nongovernmental sources in [CPS's] primary [i]ndustry."  (Final Denial Letter, J.A. at 33.)  In this regard, SBA specifically explained that CPS had failed to provide "evidence of completed contracts in the firm's primary industry" both in its initial application and in its reconsideration request (*see id.*), and after reviewing the evidence before the agency, this Court agrees that the record supports SBA's conclusion.  *See*

---

[6] Notably, CPS has expressly abandoned its previously stated position that it *had*, in fact, met the regulation's two-year requirement because it "had generated revenues for at least two consecutive years immediately prior to the date of its 8(a) BD application being submitted" in its *former* primary industry code.  (Pl.'s Mem. at 12; *see also id.* at 12–13 (asserting that "after CPS submitted its application for the 8(a) BD Program, it changed its primary industry code to a different industry that it had been operating under").)  CPS previously maintained that it was "unreasonable" for SBA to apply the two-years-in-business rule to CPS because it was "impossible" for CPS "to have generated revenues for the past two consecutive years in the primary industry that Plaintiff had just changed to" (*id.* at 13), but CPS appears to have settled on the alternative argument that SBA should have granted CPS the waiver necessary for CPS's entry into the Section 8(a) program because the proffered evidence satisfied the waiver requirements.  (*See* Pl.'s Opp'n at 15 (arguing that "[i]n this instance Plaintiff argues that a *waiver* was appropriate because CPS had just changed its primary industrial classification just after applying for admission to the 8(a) [p]rogram and, therefore, could not meet" the two-years-in-business requirement (emphasis added)); *see also id.* at 16 ("This answer is different from Plaintiff's Motion.").)

*Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009) (explaining that, under the substantial evidence standard, courts "reverse an agency's decision only when the record is so compelling that no reasonable factfinder could fail to find to the contrary" (internal quotation marks and citation omitted)).

Specifically, neither CPS's application nor its reconsideration request contained any evidence that CPS had successfully "perform[ed] contracts" in its "primary industry category," as subdivision (iv) of the waiver provision requires. *See* 13 C.F.R. § 124.107(b)(1)(iv). Instead, CPS provided in its reconsideration request a letter captioned, "Clarification on Condition [iv]: Successful Performance in Primary Industry" (Reconsideration Request, J.A. at 91), to which it attached (1) a corporate resolution addressing its change in industry code (*see id.* at 92); (2) "Current Financial Statements, not Older than 90 Days Old" (*id.* at 93); and (3) "Documentation Verifying all Revenues on Interim P & L Statement" (*id.*).[7] Critically, however, none of the information contained in these attachments plainly demonstrates that CPS has "a record of successful performance on contracts from governmental or nongovernmental sources in its primary industry category[,]" as the regulation requires. 13 C.F.R. § 124.107(b)(1)(iv). And in the absence of this required evidence, there is simply no basis for maintaining that the agency's refusal to grant CPS a waiver of the two-years-in-business requirement was unsupported and should be set aside.

Undaunted, CPS contends that it "clearly demonstrated its ability to meet [the record of successful performance] requirement" when it submitted, in its original application, a four-page letter entitled "'Two Years in Business Waiver Request[,]'"

---

[7] CPS's financial statements contain a balance sheet, income statements, and aging of accounts payable and receivable. (*See id.*)

which Coleman penned.  (Pl.'s Opp'n at 16.)  According to CPS, this "detailed letter

. . . more than meets the criteria of (b)(1)(iv)."  (*Id.* at 17.)  But the letter to which

CPS refers—while admittedly detailed—primarily describes work that CPS completed

under its *former* primary industry code.  (*See* Feb. 10, 2014 Two Years in Business

Waiver Request ("Waiver Request"), ECF No. 30-7, J.A. at 328–31.)  In fact, this letter

expressly acknowledges that "business performed under our primary NAICS code

541611 is at two percent (2%)[,]" while CPS's "dependency on [its previous] code

624190" is 85%.  (*Id.* 329; *see also id.* ("I intend to continue changing the direction of

[CPS's] business plan to encompass social services, IT, and process improvement

utilizing our primary NAICS code.").)  In this regard, CPS seems to return to a

contention that it has expressly abandoned:  that the agency should take into account

CPS's work in the prior industry code and that failing to do so is improper and/or

unfair.  (*See supra* n.6.)  But CPS does not cite any authority to support this

proposition, and this Court is not aware of any.  Nor is the regulation unclear that what

counts for waiver, as with the two-year rule itself, is an applicant's demonstrated

success in the pertinent industry code.  *See Ardmore*, 118 F. Supp. 3d 388, 391–92

("[The plaintiff] was also barred by the two-years-in-business rule because it had not

provided tax returns showing two years of revenue in the *primary industry in which it

was applying*." (emphasis added)).

The proffered letter similarly fails to identify a single successful *contract* that

CPS performed in the pertinent primary industry category, as section 124.107(b)(1)(iv)

expressly mandates.  And, indeed, CPS itself appears to acknowledge this deficiency,

insofar as its reconsideration request expressed confidence "that in the next year [CPS]

*will* have the necessary accumulation of revenue necessary to satisfy the record of performance." (Reconsideration Request, *id.* at 91 (emphasis added).)

In short, SBA has made clear that, in all events, a successful Section 8(a) program applicant must have demonstrated either two years of business performance in its primary industry code or a record of successful completion of contracts in that industry code. *See* 13 C.F.R. § 124.107. The absence of any record evidence here that satisfies either the two-year rule or the "record of successful performance" waiver requirement leads this Court to conclude that there was substantial evidence to support SBA's decision to deny CPS a waiver of the two-years-in-business requirement, as well as its conclusion that CPS had therefore failed to demonstrate its potential for success.[8]

## C. SBA's Conclusion That Coleman Was Not Economically Disadvantaged Is Consistent With The Unambiguous Text Of Its Regulation

CPS's final contention—that SBA's finding as to economic disadvantage was based on an improper interpretation of SBA's own regulation—fares no better. Specifically, CPS maintains that SBA improperly calculated Coleman's AGI to include approximately $922,000 in income that Coleman received from Harvest, which CPS argues should have been excluded from the calculation pursuant to (the proper interpretation of) SBA's own regulation. (*See* Pl.'s Mem. at 20–21.) This Court is not persuaded; instead, it concludes that the unambiguous text of the regulation supports

---

[8] On November 19, 2016, CPS filed a Notice of Change in Relevant Regulation, in which it argued that SBA's subsequent amendment to the text of 13 C.F.R. § 124.106—which addresses the issue of who "controls" an applicant company—had "a clear impact on whether CPS" had reasonable prospects for success within the meaning of 13 C.F.R. § 124.107. (Pl.'s Notice of Change in Relevant Regulation, ECF No. 33, at 4; *see also id.* at 1–2.) CPS's notice addresses an amendment that (1) is not clearly retroactive, and (2) applies to an entirely different regulation that is not at issue here. (*See* Def.'s Resp. to Pl.'s Notice of Change in Relevant Regulation, ECF No. 34.) For these two reasons, among others, any amendments that SBA subsequently made to 13 C.F.R. § 124.106 have no bearing on this case.

SBA's refusal to exclude the income that Coleman received from Harvest, for the following reasons.

The text of the regulation at issue here—13 C.F.R. § 124.104(c)(3)(ii)—is plain and unambiguous. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 203–04 (2011) (noting that a court's analysis over the "proper interpretation of" a regulation "begins with the text of [the] [r]egulation"); *see also Otsuka*, 2016 WL 4098740, at *7 (explaining that "deference to the agency's interpretation of its own regulations is not required if the meaning of the regulation is plain"). The regulation, which appears in the context of a subsection entitled "Eligibility Requirements for Participation in the 8(a) Business Development Program" and addresses the types of income that the agency considers when determining whether an applicant business is owned by an "economically disadvantaged" individual, provides:

> Income received from an applicant or Participant that is an S corporation, LLC or partnership will be excluded from an individual's income where the applicant or Participant provides documentary evidence demonstrating that the income was reinvested in the firm or used to pay taxes arising in the normal course of operations of the firm.

13 C.F.R. § 124.104(c)(3)(ii). Thus, the text plainly provides that the agency will exclude certain income from its calculation of an individual's overall income (1) when the income comes from an applicant or Participant that is itself an S corporation, LLC, or partnership, and (2) when that income is then reinvested into the firm, or used to pay the firm's taxes. *See id.* Setting aside all other requirements, at least this much is clear: the *only* relevant income for the purpose of this provision is "[i]ncome received from an applicant or Participant[.]" *Id.* And the terms "applicant" and "Participant" refer to the organizations that are either currently participating in the Section 8(a)

program, or are seeking to participate in that program, as demonstrated by the fact that these terms appear in the context of a subsection entitled "Eligibility Requirements for Participation in the 8(a) Business Development Program." *See id.* § 124.101–124.112.

In the instant case, SBA indicated that CPS had failed to satisfy the economic disadvantage requirement because the individual upon whom CPS's disadvantaged status was based—Coleman—averaged an adjusted three-year income in excess of $250,000. (*See* Final Denial Letter, J.A. at 30.) When explaining how it calculated this figure, SBA specifically referenced Coleman's AGI for each of the three years prior to CPS's application, and specifically considered, and rejected, CPS's argument that SBA should exclude from its calculation approximately $922,000 in income that Coleman received from Harvest in 2012. (*See id.*) SBA explained that "income from this company cannot be excluded" because Harvest is not the "applicant or Participant[.]" (*Id.*)

This determination was clearly consistent with the unambiguous text of the applicable regulation, and CPS has not demonstrated otherwise. Simply put, although CPS contends that Harvest was an S corporation (*see* Pl.'s Opp'n at 8), there is nothing in the record to indicate that Harvest was an *applicant* or *Participant* in the Section 8(a) program.[9] Had Coleman received the $922,000 at issue from CPS—the Section 8(a) program applicant in this matter—and also provided evidence that she reinvested those funds back into CPS or used them to pay CPS's taxes, then CPS may justifiably have argued that the $922,000 should have been excluded from Coleman's AGI. On the

_____

[9] In its opening motion, CPS originally characterized Harvest as a "C-Corporation" (Pl.'s Mem. at 7), but later referred to it as an S corporation (*see* Pl.'s Opp'n at 8). The corporate status of Harvest is not relevant to the resolution of the economic disadvantage issue in any event because, as explained above, CPS does not contend that Harvest was an applicant or Participant in the Section 8(a) program.

instant facts, however, SBA has made no such mistake, and this Court sees no reason to disturb SBA's conclusion.

CPS's arguments to the contrary are entirely unavailing. CPS contends that SBA should have excluded the $922,000 from Coleman's AGI because "[t]he *applicant*, Ms. Coleman, owned an 'S' corporation in 2012 [Harvest], and Ms. Coleman owned another 'S' corporation [CPS] at the time of submitting its 8(a) application." (Pl.'s Opp'n at 9 (emphasis in original); *see also id.* ("[I]t is the *individual*, not the company, on which the application to the 8(a) Program is based." (emphasis in original)).) According to CPS, "[t]o say that the exclusion of reinvested income permitted by [the regulation] is applicable to one 'S' corporation, but not to another, is simply not supported by the record or the regulation." (*Id.*) Once this income is properly excluded, CPS maintains, Coleman's average AGI during the relevant period was less than $250,000. (*See id.* at 8.)

CPS's argument fails for several reasons. As an initial matter, the plain language of the regulation clearly distinguishes between an "applicant or Participant" *firm* seeking entry into the Section 8(a) program, and the "individual" owner upon whom the applicant firm relies to satisfy the economic disadvantage requirement. 13 C.F.R. § 124.104(c)(3)(ii). Furthermore, it makes little sense to consider Coleman an "applicant"—as CPS suggests—because Coleman is not (nor can she ever be) an S corporation, LLC, or partnership. It is also clear to this Court that the question of whether the regulation can be read to require exclusion of income that is received from one S corporation and reinvested into a different S corporation is a red herring in the instant case because, regardless, the regulation unambiguously addresses and excludes

only income that is received from an *applicant* or *Participant* in the Section 8(a) program, which happens to be an S corporation, LLC, or partnership.  And again, there is no evidence that Harvest was a Section 8(a) program applicant or Participant, as explained above.  Finally, even if this regulatory language was somehow ambiguous, SBA's interpretation of its own regulation is neither plainly erroneous nor inconsistent with the regulatory text for all of the reasons explained above, and thus would be entitled to great deference under *Auer*.  *See Christopher*, 132 S. Ct. at 2166.

This all means that SBA's economic disadvantage determination was clearly consistent with the unambiguous text of its regulation, and should be upheld as such.

## IV.    CONCLUSION

In the end, even the most promising arguments that CPS makes in an attempt to secure a Court order requiring SBA to reevaluate its denial of CPS's Section 8(a) program application are for naught.  The Small Business Act is entirely silent regarding whether and to what extent the agency must make a finding regarding an applicant's potential for success with agency support when a Section 8(a) program application is denied, and SBA's regulations—which are crafted to ensure that only those business concerns with reasonable prospects for success are eligible for Section 8(a) program assistance—are entirely consistent with the statutory scheme that Congress crafted. There has been no mistake of law, because both the potential-for-success regulation and SBA's application of this regulation in the context of the instant case were permissible and reasonable.  And the record facts fully support SBA's conclusion that CPS failed to demonstrate both its potential for success and Coleman's economic disadvantage.

Consequently, as set forth in the Order issued previously, CPS's motion for summary judgment has been **DENIED**, and SBA's motion for summary judgment has been **GRANTED**.

DATE:  May 11, 2017                    *Ketanji Brown Jackson*
                                       KETANJI BROWN JACKSON
                                       United States District Judge